JS 44 (Rev. 12/07)(cand rev 1-16-08)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JAMES A. REDEKER | PG&E CORPORATION; and DOES I - X |

| **(b)** County of Residence of First Listed Plaintiff (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant    San Francisco (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|

| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Kathryn Burkett Dickson (SBN 70636) Dickson - Ross LLP 1970 Broadway, Suite 1045 Oakland, CA 94612    Tel: 510-268-1999 | Rita F. Gilmore PG&E Corporation P.O. Box 7442 San Francisco, CA 94120 Tel: 415-973-7547   *E-filing BZ* |

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance [ ] 120 Marine [ ] 130 Miller Act [ ] 140 Negotiable Instrument [ ] 150 Recovery of Overpayment & Enforcement of Judgment [ ] 151 Medicare Act [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) [ ] 153 Recovery of Overpayment of Veteran's Benefits [ ] 160 Stockholders' Suits [ ] 190 Other Contract [ ] 195 Contract Product Liability [ ] 196 Franchise | **PERSONAL INJURY** [ ] 310 Airplane [ ] 315 Airplane Product Liability [ ] 320 Assault, Libel & Slander [ ] 330 Federal Employers' Liability [ ] 340 Marine [ ] 345 Marine Product Liability [ ] 350 Motor Vehicle [ ] 355 Motor Vehicle Product Liability [ ] 360 Other Personal Injury | **PERSONAL INJURY** [ ] 362 Personal Injury— Med. Malpractice [ ] 365 Personal Injury — Product Liability [ ] 368 Asbestos Personal Injury Product Liability **PERSONAL PROPERTY** [ ] 370 Other Fraud [ ] 371 Truth in Lending [ ] 380 Other Personal Property Damage [ ] 385 Property Damage Product Liability | [ ] 610 Agriculture [ ] 620 Other Food & Drug [ ] 625 Drug Related Seizure of Property 21 USC 881 [ ] 630 Liquor Laws [ ] 640 R.R. & Truck [ ] 650 Airline Regs. [ ] 660 Occupational Safety/Health [ ] 690 Other **LABOR** [ ] 710 Fair Labor Standards Act [ ] 720 Labor/Mgmt. Relations [ ] 730 Labor/Mgmt.Reporting & Disclosure Act [ ] 740 Railway Labor Act [X] 790 Other Labor Litigation [ ] 791 Empl. Ret. Inc. Security Act | [ ] 422 Appeal 28 USC 158 [ ] 423 Withdrawal 28 USC 157 **PROPERTY RIGHTS** [ ] 820 Copyrights [ ] 830 Patent [ ] 840 Trademark **SOCIAL SECURITY** [ ] 861 HIA (1395ff) [ ] 862 Black Lung (923) [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI [ ] 865 RSI (405(g)) **FEDERAL TAX SUITS** [ ] 870 Taxes (U.S. Plaintiff or Defendant) [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 400 State Reapportionment [ ] 410 Antitrust [ ] 430 Banks and Banking [ ] 450 Commerce [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations [ ] 480 Consumer Credit [ ] 490 Cable/Sat TV [ ] 810 Selective Service [ ] 850 Securities/Commodities/ Exchange [ ] 875 Customer Challenge 12 USC 3410 [ ] 890 Other Statutory Actions [ ] 891 Agricultural Acts [ ] 892 Economic Stabilization Act [ ] 893 Environmental Matters [ ] 894 Energy Allocation Act [ ] 895 Freedom of Information Act [ ] 900 Appeal of Fee Determination Under Equal Access to Justice [ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** [ ] 210 Land Condemnation [ ] 220 Foreclosure [ ] 230 Rent Lease & Ejectment [ ] 240 Torts to Land [ ] 245 Tort Product Liability [ ] 290 All Other Real Property | **CIVIL RIGHTS** [ ] 441 Voting [ ] 442 Employment [ ] 443 Housing/ Accommodations [ ] 444 Welfare [ ] 445 Amer. w/Disabilities – Employment [ ] 446 Amer. w/Disabilities – Other [ ] 440 Other Civil Rights | **PRISONER PETITIONS** [ ] 510 Motions to Vacate Sentence **Habeas Corpus:** [ ] 530 General [ ] 535 Death Penalty [ ] 540 Mandamus & Other [ ] 550 Civil Rights [ ] 555 Prison Condition | **IMMIGRATION** [ ] 462 Naturalization Application [ ] 463 Habeas Corpus – Alien Detainee [ ] 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. §1514A

Brief description of cause:
Retaliatory Discharge in Violation of Sarbanes-Oxley Act of 2002

| **VII. REQUESTED IN COMPLAINT:** | [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | CHECK YES only if demanded in complaint: **JURY DEMAND:** [X] Yes [ ] No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)    [X] SAN FRANCISCO/OAKLAND    [ ] SAN JOSE

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| August 13, 2008 | Kathryn Burkett Dickson |

1  KATHRYN BURKETT DICKSON (State Bar # 70636)
   DICKSON - ROSS LLP
2  1970 Broadway, Suite 1045
   Oakland, CA 94612
3  Telephone:    (510) 268-1999
   Facsimile:    (510) 268-3627
4  E-mail:kbdickson@dicksonross.com

5
   Attorneys for Plaintiff
6  JAMES A. REDEKER

7

8                UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  JAMES A. REDEKER,                    )  Case No.  08      3872
13                                       )
        Plaintiff                        )
14                                       )  COMPLAINT FOR DAMAGES AND
                                         )  INJUNCTIVE RELIEF
15           v.                          )
                                         )  (Violation of Sarbanes-Oxley Act, 18 U.S.C.
16  PG&E CORPORATION and DOES I - X,     )  1514A *et seq.*)
                                         )
17      Defendants.                      )
18                                       )
                                         )  Jury Trial Demanded
19  _____  )

20                I. **NATURE OF THE CASE**

21      1.      This is an individual action brought by Plaintiff James A. Redeker against his

22  former employer PG&E Corporation ("PG&E"), for violation of The Public Company

23  Accounting Reform and Investor Protection Act of 2002 (commonly known as the Sarbanes-

24  Oxley Act), codified at 18 U.S.C. §1514A.  Plaintiff, a long-term, high-performing employee in

25  PG&E's Internal Auditing Department, was terminated in retaliation for reporting to company

26  management about, and so that PG&E could cover up, actual and suspected frauds and

27  improprieties involving financial, matters that the company did not want exposed or to address.

28  ///

Complaint for Damages and Injunctive Relief                                      1

1

## II. **PARTIES**

2      2.      Plaintiff James A. Redeker is, and at all relevant times has been, a lawful resident

3 of the State of California. Plaintiff was employed by PG&E in San Francisco, California, for

4 eight years, all in its Internal Auditing Department. For the last six years, he served as Manager

5 of Internal Investigations.

6      3.      Defendant PG&E Corporation is a California Corporation, with headquarters and

7 principal place of business in San Francisco, California. Plaintiff is informed and believes that it

8 operates primarily as a holding company. Its foremost subsidiary, Pacific Gas and Electric

9 Company, is one of the largest combination natural gas and electric utilities in the United States.

10 Pacific Gas and Electric Company employs about 20,000 people and serves about 5 million

11 business and residential customers throughout central and northern California. PG&E's Internal

12 Auditing Department serves the entire corporate family.

13      4.      Defendant PG&E Corporation is a publicly-held and publicly-traded corporation,

14 listed and traded on the New York Stock Exchange. Plaintiff is informed and believes that, at

15 present, PG&E holds position number 196 on the "Fortune 500" list of largest companies.

16      5.      Plaintiff does not know the true names and capacities of defendants sued as Does I

17 through X. Plaintiff will amend the complaint to show the true names of each such defendant

18 when their identities have been ascertained. Each of the Doe defendants encouraged,

19 participated in, and/or ratified and approved the conduct complained of. Each of the Doe

20 defendants was at all relevant times, the agent, employee or representative of one or more of the

21 named defendants and/or the other Doe defendants, and was acting within the course and scope

22 of such relationship.

23

## III.  **EXHAUSTION OF REMEDIES**

24      6.      Plaintiff filed a timely complaint regarding his claims under Sarbanes-Oxley with

25 the Department of Labor's Occupational Health and Safety Administration (OSHA). The

26 Department of Labor did not issue a final decision on the complaint within 180 days of the filing

27 of the administrative claim, thereby entitling Plaintiff to file this action in federal court.

28 Subsequent to the expiration of the 180 days and the filing of this action, the parties entered into

1   a tolling agreement, temporarily staying any additional deadlines.

2                    **IV.  JURISDICTION AND VENUE**

3          7.     The Court has jurisdiction over this action because Plaintiff's claims arise under a

4   federal statute.  Venue is appropriate in this Court because the actions which form the basis for

5   Plaintiff's claims occurred in San Francisco, which is within this District.

6                              **III.  FACTS**

7          8.     Plaintiff has 20 years experience performing and supervising fraud investigations.

8   He was hired by PG&E on February 23, 1998 to be a fraud-focused internal investigator in the

9   Internal Auditing Department.  During his eight years at PG&E, he was promoted three times,

10  ultimately to the position of Manager of Investigations, which he held for six years.  As manager,

11  he was responsible for administering the department's fraud-focused internal investigations

12  program (PG&E's only such program), supervising the department's internal investigators, and

13  performing internal investigations personally. He was abruptly terminated on April 24, 2006 by

14  Kent Harvey, a Senior Vice President who a few months earlier had been placed as executive

15  officer over PG&E's Audit, Risk, and Compliance organizations.  Throughout his employment,

16  Plaintiff performed consistently well, received several performance awards and bonuses, and

17  received excellent oral and written performance reviews by Internal Auditing's Senior Director

18  (now retired from the company), who hired Plaintiff originally and supervised his work for all

19  but the last few months of Plaintiff's tenure. Plaintiff always followed PG&E's requirement and

20  protocol for raising concerns about possible frauds and abuses by reporting each one to his

21  supervisor, and in calm, organized manner along with supporting detail. Before Mr. Harvey

22  became the new officer over Internal Auditing, Plaintiff never had experienced management

23  action, or inaction, in his own chain of command to condone or cover up possible fraud, abuse,

24  violation, or misconduct.

25  Plaintiff's Reports about Frauds and Improprieties within PG&E

26         9.     In the month before his employment was precipitously terminated, Plaintiff raised

27  and reported on the following matters to the lead manager of Internal Auditing (who served as

28  the department's interim supervisor, under Mr. Harvey, for a few months before arrival of the

1  permanent replacement for the long-term Senior Director, who arrived after Plaintiff was
2  terminated) and which are discussed in more detail later in this Complaint:

3          •       A significant and material weakness in internal controls for computer systems at
4                  Pacific Gas and Electric Company, which Plaintiff was informed and reasonably
5                  believed was carried out by and at the request of company Vice Presidents;
6          •       A wrongful charge of nearly $2 million (the cost of employee errors in
7                  administering a particular contract) to the rate-paying customers of Pacific Gas
8                  and Electric Company that company executives were aware of and charged to
9                  customers in secret;
10         •       Violations and inaccurate and misleading financial reporting in the highly-
11                 publicized Supplier Diversity program at Pacific Gas and Electric Company,
12                 which influences spending of hundreds of millions of dollars of ratepayer-
13                 provided funds as well as public investors' decisions about investing in PG&E;
14         •       An excessive travel expense by PG&E's President & CEO.

15         .       During the approximately six months before his termination, Plaintiff had also
16  raised and reported to this interim supervisor and to Mr. Harvey about weaknesses in PG&E's
17  anti-fraud program and anti-fraud internal controls.

18         10.     Instead of acting to properly evaluate or remedy any of these important situations,
19  Mr. Harvey ignored each one and terminated Plaintiff.

20  Significant Weakness in Computer System Controls.

21         11.     Plaintiff learned that the Chief Information Officer (CIO) and head of the
22  Information Services and Technology Systems organization for PG&E's utility company, a Vice
23  President, recently had yielded to peers who asked her not to specifically prohibit sharing of
24  passwords when updating company standards for computer system security.  To update the
25  company standards, a subordinate had copied in whole from the relevant ISO guidance but, at the
26  direction of the CIO following the other executives' requests, removed the provision explicitly
27  prohibiting the sharing of passwords. Plaintiff was informed that Vice Presidents wanted to be
28  unrestricted from their practice of giving their passwords to other people (e.g. their secretaries

1  and other assistants) so they could enter approvals for large payments and contracts with the
2  appearance that the Vice Presidents had done so themselves. At PG&E, corporate governance
3  required officer-level approval for large dollar payments and for contracts involving certain
4  subjects and risks, and prohibited delegating the approval.

5       12.     Plaintiff believed that failure to require two-way password security (prohibiting
6  giving someone your password as well as using someone else's password) would result in several
7  risks for investors and the public, including (a) fraud, error, and waste in the company's finances;
8  (b) misrepresentation of results and controls; and (c) inaccurate and untraceable records that
9  mask the identity of who actually entered transactions. Individually and collectively, these
10 avoidable risks undermine the company's regulatory-required and investor-expected internal
11 controls. The utility company's Manager of Information Systems Security told Plaintiff that he
12 shared Plaintiff's beliefs and concerns about weak password security standards but had been
13 afraid to express them within his own organization after the CIO instructed him about what the
14 company standards should and should not contain.

15      13.     Under the Sarbanes-Oxley Act), PG&E is required to have sound internal controls
16 and to attest to those controls by an officer's signed declaration under penalty of perjury. PG&E
17 declared that its controls were sound despite awareness by the CIO that password control was
18 weak and that executives had been overriding the company's transaction approval standards and
19 intended to continue to do so.

20      14.     Plaintiff reported his observations and concerns about these issues in writing to
21 his interim supervisor and was terminated later that same day. His documentation and report
22 about this weakness in important controls and apparent improprieties by senior management
23 were motivating factors in his termination.

24 Secret Misallocation to Customers of PG&E's Costly Mistake In Contract Administration

25      15.     Since early 2004, PG&E's utility company has been under government order to
26 remove groundwater that it contaminated around its natural gas compressor station in Topock,
27 Arizona. The groundwater there contains hexavalent chromium (a chemical the utility used at
28 the station) in concentration that qualifies it as hazardous waste. PG&E began the project by

1   pumping the groundwater straight into tanker trucks and hauling it to a hazardous waste disposal
2   facility, with which PG&E had a price per gallon contract. In September 2004, PG&E began
3   operating a treatment plant that it built at the Topock site to clean the water after it had been
4   brought to the surface. The treatment reduced the contaminant level sufficiently that the treated
5   water no longer qualified as hazardous waste. PG&E hauled the cleaned water to the same
6   disposal facility and renegotiated a reduced rate for disposal of the non-hazardous water. The
7   disposal facility sent its proposed new rate structure to PG&E's supervisor in Topock. PG&E's
8   Environmental Department Manager, Project Manager, and Contract Administrator all knew that
9   the water going to the disposal facility no longer was hazardous waste and that the site supervisor
10  had been assigned to negotiate a reduced rate with the disposal facility. Yet, no one at PG&E
11  finalized the facility's proposal into a contract change order to implement the reduced rate.
12  Consequently, the disposal facility continued billing at the rate existing in the contract.

13      16.     About six months later, in March 2005, the Project Manager discovered that the
14  reduced rate proposal had not been put into the contract and that the disposal facility was billing
15  at the hazardous waste disposal rate for handling the non-hazardous water. Because frauds,
16  abuses, and improprieties had been suspected and found elsewhere in the project, Plaintiff
17  investigated the overpayment, and found it had resulted from mistake and lack of oversight by
18  several PG&E employees and a PG&E contract worker. By the time the Project Manager
19  discovered the mistake, PG&E had paid nearly $2 million more than it would have paid if it had
20  put into the contract the reduced rates that the disposal facility proposed. (The figure was
21  determined by PG&E internal auditors.) Plaintiff told PG&E management about the amount of
22  overpayment and the reason it had happened.

23      17.     When Plaintiff first learned of the overpayment, in March 2005, he immediately
24  informed PG&E's Vice President for the Environmental Department, under whom the Topock
25  remediation project was progressing. (Previously, PG&E had received approval from the
26  California Public Utilities Commission ["CPUC"] to be reimbursed by rate-paying customers for
27  the project's cleanup costs through a program called the Hazardous Substance Mechanism
28  ["HSM"]. This program is significant to PG&E and its investors because of the high cost of such

Complaint for Damages and Injunctive Relief                                                          6

1 projects, and to the public because reimbursement encourages remediation of contaminated
2 sites.) The Vice President replied that PG&E should not charge the cost of this mistake to utility
3 service ratepayers through the HSM, since it resulted from PG&E's own avoidable error. He
4 said that instead, PG&E should accept responsibility for the excess cost by charging it to the
5 PG&E shareholders' account. Nevertheless, PG&E ultimately left the cost of its nearly $2
6 million mistake in the company's request for reimbursement through the HSM, disguised as a
7 normal expense of the project, and thus secretly passed the cost through its regulator and to its
8 customers.

9        18.    A year later, in March 2006, Plaintiff followed up on the overpayment in a written
10 inquiry to PG&E's in-house attorney for the project asking what final business decisions
11 management had made about financial accounting and individual accountability for the error, but
12 received no reply. In early April, 2006, Plaintiff learned from PG&E's bookkeeper for HSM
13 reimbursements that PG&E never had re-allocated the nearly $2 million expense out of its HSM
14 reimbursement request and into a shareholder account. Plaintiff was told shortly thereafter that
15 PG&E management intentionally had not changed the expense from an HSM reimbursement to a
16 charge to shareholders since management believed CPUC auditors were unlikely to find the
17 mistake if they ever audited the project, so PG&E likely could get away with leaving it charged
18 to the customers. Concerned about the apparent devious ethic of this decision, Plaintiff wrote to
19 his interim supervisor explaining the mistaken overpayment, expressing concern that it appeared
20 to have been accounted for improperly, and suggesting that PG&E internal auditors verify
21 whether it had been handled according to law, company policy, and sound business ethics.
22 Plaintiff received no reply to his concern about management's behavior in this regard and instead
23 was terminated two weeks later, without the overpayment issue having been fully and
24 independently examined, or rectified. (In September, 2007, following Plaintiff's termination and
25 after evaluating an unrelated case, the CPUC announced that PG&E shareholders, not ratepayers,
26 must bear the burden of PG&E's mistakes.) Plaintiff's report of concern in this regard was a
27 motivating factor in his termination.

28 ///

Complaint for Damages and Injunctive Relief                                                    7

1  Violations and Misleading Reports in PG&E's Supplier Diversity Program

2   19.  PG&E's utility company (along with other utilities in California) is required by
3  the CPUC to have a supplier diversity program to reach out to "diverse suppliers," that is
4  businesses owned by certain ethnic minorities, women, and service-disabled veterans and provide
5  them with the "maximum practical opportunity" to do work on contract for the company.
6  PG&E's Supplier Diversity Program influences spending of hundreds of millions of dollars of
7  ratepayer-provided funds ($492 million in 2006) as well as public investors' decisions about
8  investing in PG&E.  PG&E reports its Supplier Diversity Program results on an annual basis to
9  the CPUC and publicly to shareholders, potential investors, oversight organizations, and others.
10  A CPUC Order outlines the program, and provides that utilities may take credit for spending with
11  diverse firms when they act either as a prime contractor or as a subcontractor at any level.  Based
12  on the Commission's stated intent of maximizing work opportunities for diverse firms, it is
13  apparent that PG&E may rightly take diversity credit only for amounts of work done by diverse
14  firms themselves and PG&E may not credit itself for full amounts paid to a relative few diverse
15  contractors who act as fronts or pass-throughs for work actually performed by a relative lot of
16  non-diverse sub-contractors.  Plaintiff learned that PG&E regularly credited itself with, and
17  publicized, tens of millions of dollars in diversity spending for payments it made to diverse
18  contractors who PG&E knew performed much of their work assignments through non-diverse
19  subcontractors.  PG&E's program concerned Plaintiff for several reasons, including that (a) it
20  accounted for diversity spending a manner that appeared to violate the Order; (b) it actually
21  minimized, rather than maximized as required, opportunities for diverse firms to work for
22  PG&E, and ©) PG&E's reports misled the CPUC, investors, and the public about the extent to
23  which PG&E's program supported the diverse community.

24   20.  As noted, supplier diversity program results are not just reported to the CPUC.
25  PG&E widely and publicly touted the "success" of its program, measured by the total value and
26  annual increases for payments to diverse firms.  Plaintiff reasonably believed that PG&E's
27  actions might violate U.S. Securities and Exchange Commission regulations prohibiting false or
28  misleading statements to investors through the results it provided about its Supplier Diversity

Complaint for Damages and Injunctive Relief      8

1 Program in its Annual Report and Corporate Responsibility Report. The public (including
2 current shareholders and potential investors, individuals and fund managers alike) could consider
3 the claimed success of this highly-publicized program in making investment decisions,
4 particularly investors desiring to invest in socially responsible companies.

5 21. Plaintiff reported his observations and concerns of impropriety and misreporting
6 associated with PG&E's supplier diversity program in a written memo to his interim supervisor
7 who said that he forwarded it to Mr. Harvey. Plaintiff received no reply and instead was
8 terminated one month later. Although the program influenced spending of hundreds of millions
9 of dollars of ratepayer-provided funds, PG&E never audited it. After reporting his concerns in
10 this regard, Plaintiff learned that PG&E's manager for such audits had said that auditing the
11 program would be a "career-ending move." Consistent with that prediction, Plaintiff's report of
12 concern about this matter was a motivating factor in his termination.

13 Excessive Travel Expenses by PG&E's President & Chief Executive Officer

14 22. While reviewing a database of expenses for an unrelated investigation, one of
15 Plaintiff's subordinates saw an unusually high dollar travel expense and informed Plaintiff. They
16 soon determined that it had been incurred by the person who is PG&E's President & CEO, who
17 in early 2006, traveled to Florida and back, one time, alone, in a 25-seat private jet for a routine
18 business meeting (no unusual or emergency purpose was documented); the cost was $60,000 for
19 the airfare alone. PG&E's written corporate policy requires reasonableness in every employee's
20 expenses and specifies that waivers are not granted. Plaintiff reasonably believed the expense
21 was exorbitant and thus violated company standards as well as fiduciary duties owed when
22 spending shareholder funds (this expense was charged primarily to the company's investors,
23 rather than to customers). In addition, Plaintiff was concerned that this excessive charge revealed
24 weakness in the company's internal control environment, since "tone at the top" is well
25 established as an important factor for controlling fraud, abuse, waste, and violations throughout a
26 company.

27 23. Plaintiff reported his observations and concerns about the matter, in writing, to his
28 interim supervisor. The very next business day, Mr. Harvey (who reports directly to PG&E's

1 | President & CEO) terminated him. Plaintiff's report of concern about this matter was a
2 | motivating factor in his termination.

3 | Weaknesses in PG&E's Federally-Mandated Anti-fraud Program and Anti-fraud Internal
4 | Controls

5 |      24.     During the six month period before his termination, Plaintiff orally raised
6 | concerns to his interim supervisor, and some directly to Mr. Harvey, that PG&E's federally
7 | mandated anti-fraud program and anti-fraud internal controls were weak for several specific
8 | reasons. For example, following Sarbanes-Oxley's increased focus on fraud awareness, PG&E's
9 | Legal Compliance and Business Ethics department compiles a Fraud Report for the Audit
10 | Committee of the Board of Directors to review each quarter. The list is required to contain all
11 | proven frauds and all suspected frauds.

12 |      25.     Among Plaintiff's expressed concerns were that (a) reports required for informing
13 | PG&E's Board of Directors (which is ultimately responsible for overseeing the anti-fraud
14 | program) about the quantity, type, severity, and participants in frauds were incomplete because of
15 | omissions by contributing departments, (b) PG&E had not performed a company-wide fraud risk
16 | assessment to identify possible frauds, where and how they could occur, and implement
17 | appropriate preventive and detective controls, (c) utility company in-house lawyers would not
18 | approve a corporate definition of "fraud" to use in evaluating employee conduct and
19 | implementing effective anti-fraud efforts, (d) the Corporate Security Department, which
20 | occasionally investigated fraud, apparently followed lesser standards than Internal Auditing
21 | (Plaintiff identified some frauds that Security investigated and failed to find but Plaintiff's team
22 | uncovered later), and (e) the utility company sometimes allowed employees involved in
23 | established frauds to continue holding positions of significant financial or operational
24 | responsibility. Plaintiff's expressed concerns about these weaknesses were a motivating factor in
25 | his termination.

26 | Defendants' Explanation for Terminating Plaintiff is False

27 |      26.     PG&E was aware of Plaintiff's complaints and concerns about the above-
28 | described issues because he stated them to his interim supervisor (a lead manager who worked

1  directly under a corporate officer, Mr. Harvey), and some to Mr. Harvey himself, in writing and
2  orally. His written and oral reports of his observations and concerns were contributing and
3  motivating factors in the company's decision to terminate Plaintiff.

4      27.    At the time of Plaintiff's termination on April 24, 2006, Mr. Harvey told Plaintiff
5  he was being terminated as part of "re-structuring." Mr. Harvey's explanation was a pretext,
6  however, for what actually was retaliation against Plaintiff for exposing sensitive, expensive, and
7  embarrassing frauds, abuses, improprieties, and weaknesses often involving high-ranking
8  employees, and an effort to cover up those matters. This is evidenced by the following facts,
9  among others:

10     •    Plaintiff had overwhelmingly positive performance reviews, as recently as
11          September 2005, from Internal Auditing's long-term Senior Director who
12          supervised Plaintiff for seven and one half years before Mr. Harvey became the
13          department's executive officer in October 2005. No one ever informed Plaintiff
14          that his work was unsatisfactory in any way.

15     •    Despite a very positive and recent written performance review by the person who
16          knew Plaintiff's work best and for nearly eight years, the termination document
17          sent to Plaintiff summarizing the purported reasons for severing him states ". . .
18          we reviewed the future operational needs of the department, as well as your work
19          duties, skills, abilities, work history, performance, and competencies to meet those
20          future needs. As a result of our review we are unable to provide you an
21          assignment in our reorganized department . . ." . In other words, as soon as
22          Plaintiff reported very serious issues about fraud and public safety, Internal
23          Auditing's new executive suddenly claimed to be unable to identify any position
24          under his vast authority where Plaintiff's twenty years worth of experience in
25          fraud investigation and supervision could serve PG&E.

26     •    Plaintiff was the only person ultimately terminated during this alleged "re-
27          structuring."

28     •    Mr. Harvey told Plaintiff that the reorganization involved moving responsibility

Complaint for Damages and Injunctive Relief                                           11

1           for internal fraud investigations (but not the investigators themselves) from the

2           Internal Auditing Department's fraud specialist investigators to the Corporate

3           Security Department generalists, which would handle all internal fraud

4           investigations along with its very wide array of other duties and with its existing

5           staff, thereby diluting PG&E's focus on internal fraud investigations.

6   •      Mr. Harvey changed the company's internal fraud investigations program in this

7           major way even though (a) corporate governance set by the Board of Directors

8           explicitly stated that responsibility for internal fraud investigations was committed

9           to the Internal Auditing Department, not to Corporate Security, (b) Security was a

10          department within PG&E's utility company and as such could not investigate

11          throughout PG&E's corporate family, whereas Internal Auditing was a department

12          in PG&E's holding company and could serve all of the entities, and (c) only

13          Internal Auditing, not Security, had authority to access all business records (a key

14          to successfully investigating fraud).

15  •      Mr. Harvey offered only Plaintiff's subordinates the opportunity to continue

16          working for PG&E, in audit positions in Internal Auditing. He did not offer such

17          to Plaintiff, even though he was at least as well qualified for the positions offered

18          to the others.

19  •      Plaintiff was terminated without being offered opportunities or services to seek

20          redeployment within the company, which had been provided to other high-

21          performing employees when laid off for valid business reasons. Instead, Mr.

22          Harvey shut off Plaintiff's electronic building access card keys in advance of the

23          termination meeting, demanded Plaintiff's other keys on the spot, and

24          immediately revoked his company-issued computer. He was not allowed the

25          normal course of completing any of his in-progress work or helping transition his

26          caseload to someone else.

27  •      Plaintiff had seen nothing in writing and had heard nothing in advance of this

28          supposed "restructuring" of the investigations function, even though it was a

1               major change for the company, and Plaintiff was part of the Internal Auditing

2               Department's leadership team that met weekly to discuss developments, large and

3               small, in the department, company, and industry.

4       28.      In fact, Plaintiff was not terminated as part of a "re-structuring" but, rather,

5 because he raised concerns and complaints about suspected frauds and improprieties involving

6 financial, operational, and regulatory matters that the company did not want uncovered or

7 addressed.

8       29.      Plaintiff was stunned at his sudden and unlawful dismissal from a company he

9 had served so well and so loyally. He believed that his urging PG&E to act honestly, investigate

10 thoroughly, report accurately, and comply with regulations protecting investors was in the public

11 interest. He raised the concerns that he did simply to ensure that PG&E executives complied

12 with the law and their public obligations. PG&E responded by terminating him and ending his

13 long and distinguished career.

14                            **IV. FIRST CAUSE OF ACTION**

15                            (Violation of 18 U.S.C. §1514A)

16       30.      Plaintiff incorporates by reference paragraphs 1 through 29 of this Complaint.

17       31.      Defendant's actions in terminating Plaintiff under the circumstances alleged

18 above, violate the Sarbanes-Oxley Act of 2002, Public Law 107-204; 18 U.S.C. §1514A.

19 Defendant's conduct in terminating Plaintiff under these circumstances constitutes unlawful

20 retaliation under the Act.

21       32.      As a proximate result of Defendant's actions, Plaintiff has suffered and continues

22 to suffer substantial loss of earnings and other employment benefits, and has suffered and

23 continues to suffer pain, embarrassment, humiliation and severe mental anguish, all to his

24 damage in an amount according to proof.

25       33.      Defendant's actions were willful, malicious, fraudulent and oppressive, and were

26 committed with the wrongful intent to injure Plaintiff and in reckless disregard of Plaintiff's

27 rights.

28       WHEREFORE, Plaintiff seeks relief as set forth below.

1

## V.  **REQUEST FOR RELIEF**

2      Plaintiff seeks judgment against Defendant as follows:

3      1.     Compensatory damages, including lost past and future wages and benefits, and

4   emotional distress damages, in a sum according to proof;

5      2.     Reinstatement or front pay in lieu of reinstatement, in a sum according to proof;

6      3.     Punitive damages, in a sum according to proof;

7      4.     Interest on judgment, including prejudgment interest, at the legal rate;

8      5.     Attorneys' fees and costs;

9      6.     An injunction ordering Defendant to cease and desist its unlawful practices with

10   regard to retaliating against employees who raise concerns or complaints about conduct that they

11   reasonably believe to be unlawful or fraudulent under the Act;

12     7.     Such other and further relief as the Court may deem proper.

13                                      *DICKSON - ROSS LLP*

14

15     Dated: August 12, 2008          By:   Kathy Burket Dickson
                                              KATHRYN BURKETT DICKSON
16                                            Attorneys for Plaintiff
                                              James Redeker
17

18   **DEMAND FOR JURY TRIAL**

19     Plaintiff demands a jury trial on all claims.

20
                                        *DICKSON - ROSS LLP*
21

22     Dated: August 12, 2008          By:   Kathy Burket Dickson
23                                            KATHRYN BURKETT DICKSON
                                              Attorneys for Plaintiff
24                                            James Redeker

25

26

27

28

Complaint for Damages and Injunctive Relief                                              14